IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

MICHAEL CHAMBERLAIN and TONYA CHAMBERLAIN
INDIVIDUALLY, AND ON BEHALF OF THE
ESTATE AND WRONGFUL DEATH HEIRS AT LAW OF
AUSTIN HUNTER CHAMBERLAIN, DECEASED PLAINTIFFS

V. CIVIL ACTION NO. 4:21-CV-170-SA-JMV

DRY DOCK BAR & GRILL, INC.,
JC RENTALS, INC., CHARLES MARTER,
PATRICIA RICHARDSON, and JOHN/JANE DOES 1-10 DEFENDANTS

ORDER AND MEMORANDUM OPINION

On December 20, 2021, Michael Chamberlain and Tonya Chamberlain, individually and on behalf of the estate and wrongful death heirs at law of Austin Hunter Chamberlain ("the Plaintiffs") initiated this civil action by filing their Complaint [1]. Now before the Court are three separate Motions: Charles Marter's Motion for Summary Judgment [134]; Patricia Richardson's Motion for Summary Judgment [136]; and JC Rentals, Inc.'s Motion for Summary Judgment [138]. All three Motions [134, 136, 138] are ripe for review. Having reviewed the filings, as well as the applicable authorities, the Court is prepared to rule.

*Relevant Background*

The underlying events from which this lawsuit stems occurred on the night of October 23, 2021 and into the following morning. Austin Hunter Chamberlain and Maxley Baxter visited Dry Dock Bar & Grill located in Grenada County, Mississippi. At the time, Chamberlain and Baxter were both nineteen years old. Chamberlain and Baxter apparently spent several hours at Dry Dock and, while there, both consumed alcohol.

Eventually, they left the establishment in a vehicle with Baxter driving. The vehicle was owned by Baxter's stepfather, David Hoglund. At approximately 2:00 AM, Chamberlain and

Baxter had a wreck when the vehicle left a curved, two-lane road and collided with multiple trees. Chamberlain was ejected from the vehicle and ultimately died. An alcohol blood test was administered on Baxter, yielding a .26 BAC result. He later pled guilty to aggravated vehicular homicide and received a sentence of 20 years with 14 years suspended—he is currently incarcerated.

As of October 2021, the real property on which Dry Dock operates was owned by JC Rentals. In January 2022 (around three months after the accident occurred), the property was conveyed to Dry Dock via a deed recorded in the Grenada County land records. Patricia Richardson and Charles Marter are the two managers/members of JC Rentals, and JC Rentals' operating agreement indicates that they each possess a 50 percent interest in the entity. Similarly, Richardson and Marter were (and still are) the sole members of Dry Dock. For further context, Marter is Baxter's grandfather.

The Plaintiffs brought suit against Baxter, Hoglund, Dry Dock, JC Rentals, Richardson, and Marter. In the Amended Complaint [14], they assert a claim against Baxter for negligent operation of a motor vehicle and against Hoglund for negligent entrustment. On March 20, 2023, this Court entered an Agreed Order of Dismissal *with Prejudice* [125] as to Baxter and Hoglund. They are no longer Defendants in this case.

Thus, the remaining Defendants are Dry Dock, JC Rentals, Richardson, and Marter. Against those Defendants, the Plaintiffs assert claims for dram shop liability, negligence per se, attractive nuisance, and gross negligence. JC Rentals, Richardson, and Marter have each filed separate requests for dismissal of the claims asserted against them.

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id*. (quoting *Celotex*, 477 U.S. at 323). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

As noted above, the Plaintiffs assert claims against Dry Dock, JC Rentals, Richardson, and Marter for dram shop liability, negligence per se, attractive nuisance, and gross negligence. The

present Motions [134, 136, 138] do not necessarily concern the merits of those claims but instead relate to whether JC Rentals, Richardson, and/or Marter are proper Defendants as to those claims. More specifically, Richardson and Marter argue that there is no basis for them to be held liable simply because of their status as LLC members. For its part, JC Rentals contends that it is an entity existing completely separate and independent of Dry Dock and therefore cannot be held liable for the underlying conduct of Dry Dock.

Prior to addressing the merits of the Motions [134, 136, 138], the Court will briefly address one issue associated with the corporate structure of both Dry Dock and JC Rentals. Both entities were initially formed as LLCs. However, both entities were erroneously converted to corporations in April 2021. In an affidavit, Marter provided the following information:

> As we explained in our depositions, our accountant Carrie Vincent intended to file an annual report for Dry Dock, LLC with the Mississippi Secretary of State in April 2021. Inadvertently, instead of filing an annual report, Ms. Vincent filed a document which converted Dry Dock, LLC to a corporation, Dry Dock, Inc. This was unknown to me or Patricia Richardson until it was discovered in December 2021, at which time Ms. Vincent converted Dry Dock back to a limited liability company, Dry Dock, LLC. Our attorneys have been fully transparent with this information, and I have previously testified to this.

[134], Ex. 8 at p. 2.

Similarly, acting as JC Rentals' designee for its Rule 30(b)(6) deposition, Richardson testified that Vincent made the same mistake in connection with JC Rentals' status in April 2021 and that the entity was converted back to an LLC in December 2021. *See* [138], Ex. 6 at p. 3.

Thus, although both entities were technically corporations as of October 2021, they have at all times operated as LLCs. The parties do not ask the Court to make any determination as to the impact of this issue for purposes of the present Motions [134, 136, 138], but the matter is one

that the Court feels compelled to note because the parties do expend some effort addressing the issue in depositions and their respective filings.

*I. Marter and Richardson's Motions [134, 136]*

The Court will begin with Marter and Richardson's requests for dismissal. Although filed separately, Marter and Richardson raise the same arguments in their Motions [136, 138]. In fact, much of their respective supporting Memoranda [137, 139] is identical.

The crux of their arguments is as follows: "by statute and pursuant to the Operating Agreement of Dry Dock, LLC, Richardson [and Marter], simply by being a member [or members] of Dry Dock, LLC cannot be liable for the torts or obligations of the limited liability company." [137] at p. 19.

Section 79-29-311 of the Mississippi Code addresses LLC members' potential liability to third parties:

> (1) Except as otherwise provided by this chapter, the debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company, and no members, manager or office of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member, acting as a manager or acting as an officer of the limited liability company.
>
> (2) A member, manager or officer of a limited liability company is not a proper party to a proceeding by or against a limited liability company, by reason of being a member, manager or officer, as applicable, of the limited liability company, except:
>
> (a) Where the object of the proceeding is to enforce a member's, manager's or officer's right against or liability to the limited liability company; or

> (b) In a derivative action brought pursuant to Article 11 of this chapter.
>
> (3) Notwithstanding the provisions of subsections (1) and (2) of this section, under an operating agreement or under another agreement, a member, manager or officer may agree to be obligated personally for any or all of the debts, obligations and liabilities of the limited liability company.

MISS. CODE ANN. § 79-29-311.

As the statutory language makes clear, an LLC is an entity with an identity separate and distinct from that of its members; however, "there are situations justifying piercing the veil of an LLC." *Rest. of Hattiesburg, LLC v. Hotel & Rest. Supply, Inc.*, 84 So.3d 32, 39 (Miss. Ct. App. 2012). It is also well-established that "piercing the veil of an LLC should be reserved 'for factual circumstances which are clearly extraordinary—where to do otherwise would "subvert the ends of justice."'" *Id*. (quoting *Gray v. Edgewater Landing, Inc.*, 541 So.2d 1044, 1046 (Miss. 1989); *Johnson & Higgins of Miss., Inc. v. Comm'r of Ins.*, 321 So.2d 281, 284 (Miss. 1975)).

Generally, to successfully pierce the veil of an LLC, "the complaining party must prove LLC membership as well as (a) some frustration of contractual expectations, (b) flagrant disregard of LLC formalities by the LLC members, and (c) fraud or misfeasance by the LLC member." *Brown v. Waldron*, 186 So.3d 955, 960 (Miss. Ct. App. 2016) (quoting *Rest. of Hattiesburg*, 84 So.3d at 39; *Gray*, 541 So.2d at 1047). Notably, these considerations are more geared toward contract claims as opposed to tort claims. But the Mississippi Supreme Court, citing the Fifth Circuit, has recognized that "the attitude toward judicial piercing of the corporate veil is *more flexible in tort*[.]" *Penn Nat. Gaming, Inc. v. Ratliff*, 954 So.2d 427, 431-32 (Miss. 2007) (overruled on other grounds in *Purdue Pharma L.P. v. State*, 256 So.3d 1 (Miss. 2018) (quoting *Miles v. Am. Tel. & Tel. Co.*, 703 F.2d 193, 195 (5th Cir. 1983)) (emphasis added). "[T]he general rule is well established that when a corporate officer directly participates in or authorizes the commission of a

tort, even on behalf of the corporation, he may be held personally liable." *Lancaster v. Miller*, 319 So.3d 1174, 1179 (Miss. Ct. App. 2021) (quoting *Miss. Printing Co. v. Maris, West & Baker Inc.*, 492 So.2d 977, 978 (Miss. 1986)) (additional citation omitted).

To support their position that the veil of Dry Dock should not be pierced, Marter and Richardson emphasize that they "had no knowledge that Austin or Baxter were going to Dry Dock." [137] at p. 18. They also emphasize that they were not present at Dry Dock on the night in question. They both testified to these facts in their affidavits. *See* [134], Ex. 8 at p. 2; [136], Ex. 8 at p. 2. Thus, they contend that to hold them personally liable would essentially be holding them responsible based only on their LLC membership status, running afoul of the plain language Section 79-29-311(1).

On the other hand, the Plaintiffs emphasize the deposition testimony of Megan White, a regular bartender at Dry Dock (who apparently was *not* on duty on the night in question), who testified about a conversation she had with Nikki Knox (who *was* the bartender on duty that night). That testimony was as follows:

> Q. So, obviously, this was a big event for that -- this accident was a big event for that area?
>
> A. Oh, yes, it was.
>
> Q. And it being Mr. Marter's grandson made it a --
>
> A. Yes.
>
> Q. -- even more of a bigger event. What discussions did you have with Nikki about that event?
>
> A. None really.
>
> Q. None?
>
> A. I mean, we talked about it and I asked her did she serve him alcohol, and that was about it.

Q. What did she say?

A. *She said that she did, but she was told that she could*. So . . .

Q. She was told that she could? Did she say who told her she could?

A. No.

[142], Ex. 4 at p. 2 (emphasis added).

During her deposition, Knox asserted her Fifth Amendment right and refused to answer numerous questions:

Q. And you admit that you were instructed by Charles Marter to furnish alcohol to Max on October 23rd and 24th of 2021?

A. Based on the advice of my attorney, I'm asserting my Fifth Amendment right.

Q. And you admit that Max was not charged or did not pay for any of the alcohol that he consumed on October 23rd and 24th of 2021?

A. Based on the advice of my attorney, I'm asserting my Fifth Amendment right.

. . .

Q. And you admit that Max had been served alcohol at the Dry Dock Bar prior to October 23rd and 24th of 2021?

A. Based on the advice of my attorney, I'm asserting my Fifth Amendment right.

Q. And you admit that, prior to October the 23rd of 2021, that Charles Marter had instructed you that Max could be furnished alcohol at the Dry Dock Bar?

A. Based on the advice of my attorney, I'm asserting my Fifth Amendment right.

Q. And you admit that, before October the 23rd of 2021, that Charles Marter told you that Max was not to pay for any alcohol that was furnished to him at the Dry Dock Bar?

> A. Based on the advice of my attorney, I'm asserting my Fifth Amendment right.
>
> Q. And you admit that, before October 23rd, 2021, that Charles Marter knew that Max was allowed to obtain alcohol and not pay for that alcohol at the Dry Dock Bar?
>
> A. Based on the advice of my attorney, I'm asserting my Fifth Amendment right.
>
> . . .
>
> Q. Admit that you got a paycheck or compensation from Charles Marter for work done on the night of October 23rd/24th, 2021, don't you?
>
> A. Based on the advice of my attorney, I'm asserting my Fifth Amendment right.
>
> Q. And you admit that you got a paycheck and/or compensation from Patricia Richardson for work done on October 23rd and 24th of 2021, don't you?
>
> A. Based on the advice of my attorney, I'm asserting my Fifth Amendment right.

[142], Ex. 5 at p. 2-5.

"The Fifth Amendment 'does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.'" *Midwest Feeders, Inc. v. Bank of Franklin*, 114 F. Supp. 3d 419, 431 (S.D. Miss. 2015) (quoting *F.D.I.C. v. Fidelity & Deposit Co. of Md.*, 45 F.3d 969, 977 (5th Cir. 1995); *Baxter v. Paligiano*, 425 U.S. 308, 318, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976)); *see also Hernandez v. Theriot*, 709 F. App'x 755, 757 (5th Cir. 2017) ("Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify.") (citation omitted). "[A] non-party's silence in a civil proceeding implicates Fifth Amendment concerns to an even lesser degree." *Id*. (quoting *Fidelity & Deposit Co. of Md.*, 45 F.3d at 977; *RAD Servs., Inc. v. Aetna Cas. & Sur. Co.*, 808 F.2d 271,

275 (3d Cir. 1986)). The Court is cognizant, however, that the Fifth Circuit has previously recognized that a party's failure to testify to collateral matters without more is insufficient to create a question of fact. *See State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 119 (5th Cir. 1990).

In analyzing the parties' respective arguments, the Court begins by emphasizing the testimony of White and Knox—testimony this Court finds to be critical. Although White testified that Knox did not disclose *who* told her that she could serve Chamberlain and Baxter alcohol, she clearly testified that Knox said that *somebody* told her that she could.

The Plaintiffs attempted to learn more about that topic in Knox's deposition by asking her about it. But, as noted above, she refused to answer when specifically asked whether it was Marter who told her that she could serve Chamberlain and Baxter alcohol. While Knox was certainly within her rights to refuse to answer, the applicable law makes clear the Fifth Amendment does not preclude an adverse inference—particularly where, as is the case here, the person refusing to testify is a non-party. *See*, *e.g.*, *Midwest Feeders*, 114 F. Supp. 3d 431. The Court finds an adverse inference to be appropriate here. Frankly, to hold otherwise would, in this Court's view, perpetuate an injustice since White's deposition makes clear that Knox told her that somebody told her she could serve Chamberlain and Baxter, but Knox declined to answer when specifically asked about that issue. Certainly a party should not be permitted to utilize a non-party's invocation of the Fifth Amendment as a shield to liability—especially when other corroborating evidence (in this case, White's testimony) exists.[1] A question of fact exists as to whether Marter specifically told Knox that she could serve alcohol to Chamberlain and Baxter.

[1] The fact that Chamberlain and Baxter allegedly were not required to pay for the alcohol they consumed further corroborates the contention that it was Marter (an owner of Dry Dock) who instructed Knox that she could serve them alcohol. The Plaintiffs contend that Chamberlain and Baxter were not required to pay, and, as the above-quoted language from her deposition shows, Knox declined to answer that question when specifically asked.

In reaching this conclusion, the Court is cognizant of the Defendants' contention that "[t]he argument that some unidentified person allegedly gave permission for Austin [Chamberlain] and Max [Baxter] to drink at Dry Dock is not sufficient to impute liability to Marter individually, who never employed the bartender. . . [And] an alleged statement by an unknown person is clearly inadmissible hearsay." [155] at p. 7. The Court finds this to be a mischaracterization of the applicable facts, as well as the applicable law.

First, an implication that the statement was made by an unidentified person is not necessarily accurate. While there has been no testimony regarding who gave White permission to serve Chamberlain and Baxter without requiring payment, based on the Court's finding above, there is an adverse inference that Marter did so. And, to be clear, Knox never testified that she did not know who told her she could serve alcohol to Chamberlain and Baxter; rather, it was only White who did not know. The Court finds this to be an important distinction. And again, Knox declined to answer when asked.

Furthermore, the Defendants' contention that the statement is "clearly inadmissible hearsay" misses the mark. *Id*. At the summary judgment stage, the evidence need not be in admissible form but need only be "capable of being presented in a form that would be admissible in evidence." *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (quotation marks and citation omitted); *see also Lee v. Offshore Logistical and Transport, LLC*, 859 F.3d 353, 355 (5th Cir. 2017). Here, there is certainly a context in which this evidence could be presented in an admissible form—such as a specific inquiry to White as to who told her that she could serve Chamberlain and Baxter. The Defendants' argument on this point is easily rejected.

The Court also finds a couple of other issues to be noteworthy. As noted above, Knox declined to answer when asked specific questions about the payment she received for the work on

the night in question. For example, she declined to answer when asked whether she received payment from Marter and/or Richardson for the work she performed on the night in question. *See* [142], Ex. 5 at p. 4. Applying an adverse inference based upon this failure to respond, the Court finds the existence of a question of fact as to whether Marter and Richardson personally paid Knox for her work at Dry Dock. Therefore, the Court further finds a question of fact exists as to whether Marter and Richardson were conducting their own personal and corporate business on an interchangeable basis. *See*, *e.g.*, *Stanley v. Miss. State Pilots of Gulfport, Inc.*, 951 So.2d 535, 541 (Miss. 2006) ("The rationale used by courts in permitting the corporate veil to be pierced is that if a principal shareholder or owner conducts his private and corporate business on an interchangeable or joint basis as if they were one, he is without standing to complain when an injured party does the same.") (quoting *A&L, Inc. v. Grantham*, 747 So.2d 832, 843-44 (Miss. 1999)).

Further, although the Court is cognizant of Marter and Richardson's position that they did not know Chamberlain and Baxter were going to Dry Dock that night, Marter did testify that Chamberlain and Baxter were planning to spend the night at a cabin located nearby that was owned by Marter and Richardson. Marter testified that he had seen Chamberlain and Baxter at the cabin earlier that day, talked with them, and that they planned to come back to the cabin that night. *See* [134], Ex. 2 at p. 10-11. Again, although Marter categorically denies granting permission for Knox to serve Chamberlain and Baxter, there is also evidence in the record that Chamberlain and Baxter had seen and conversed with Marter earlier that day and planned to come back to Marter and Richardson's cabin (which was located close to Dry Dock) that night. The Court finds that a reasonable jury *could* conclude that Marter knew Chamberlain and Baxter was going to Dry Dock that night.

Ultimately, the Court finds that questions of fact exists, such that Marter and Richardson are not entitled to summary judgment. To be clear, this finding is not based on their mere status as LLC members but, rather, is based upon the specific evidence indicating their potential personal involvement in the commission of wrongful conduct. Marter and Richardson's Motions [134, 136] are DENIED.

*II. JC Rentals' Motion [138]*

As previously indicated, the crux of JC Rentals' Motion [138] is that it is an entity separate and distinct from Dry Dock and that it should not be held responsible for any culpability of Dry Dock.

In his deposition, Marter provided the following explanation of JC Rentals' business:

> Q. JC Rentals. And what does JC Rentals do or own?
>
> A. We've got the motel part and the rental part.
>
> Q. . . . When you say "motel part," do you have a motel?
>
> A. It's cabin rentals that we [r]ent to people when they come there to fish.
>
> Q. And where are those rentals?
>
> A. Southwest of Dry Dock.
>
> Q. Is it 5 miles southwest of Dry Dock or just right next to the -- in the parking lot?
>
> A. It's not in the parking lot. It's across the road. There's a little road in between.

[138], Ex. 4 at p. 4-5.

During her deposition, Richardson further explained JC Rentals' operations:

> Q. So explain what JC Rentals owns for me, please.
>
> A. JC Rentals owns the cabins and the --

Q. Say it again.

A. The cab- -- the rental property, cabins.

Q. And what employees does JC Rentals have?

A. Susan Andrews.

Q. And what is your position with JC Rentals?

A. I guess I'm kind of manager.

[138], Ex. 5 at p. 4.

Richardson was later questioned about Andrews' employment with JC Rentals and the interplay with Dry Dock:

Q. Do you pay the waitresses?

A. Yes.

Q. Is that a "yes"?

A. Dry Dock pays them.

Q. Do you write -- are you the one writing the check on behalf of Dry Dock?

A. The ones that are on a check. When Susan does her work down there and checks up, Dry Dock pays her.

. . .

Q. All right. So Susan gets paid by JC Rentals?

A. No. She gets paid -- she goes to Dry Dock and checks up. And she gets paid weekly for that. That's about an hour. And then she's off of Dry Dock, and she comes to work for us at JC Rentals.

Q. Okay. And what does Susan do down there for about an hour?

A. She Xs and Zs the register to see what the sales were, and she gets the money together. And she takes food -- I mean, inventories of the food and the beer.

*Id*. at p. 6-7.

Richardson was then further questioned about the intersection between JC Rentals' business and Dry Dock's business:

Q. Do you get any money from Dry Dock Bar & Grill, cash or check?

A. No. I get -- we have pool tables in there. And I get the money. That's what we get out of it is pool table -- the games in there, and that goes into JC Rentals.

Q. Okay. So JC Rentals has pool tables --

A. Yes.

Q. -- that they rent to Dry Dock?

A. Right.

Q. And the money out of the pool tables goes into JC Rentals' account?

A. Yes.

Q. Is there -- is there a lease? Is there a document that sets that out, or is that just an agreement between the two?

A. We have pool tables, and that's just an agreement.

*Id*. at p. 9.

In addition to testifying in her individual capacity, Richardson was also designated as JC Rentals' representative for its Rule 30(b)(6) deposition. During that deposition, she provided further context about JC Rentals' equipment at Dry Dock:

Q. And I believe that you had stated that that -- while this particular piece of property we talked about around the time of the accident -- the incident in October of 2021, you had

stated then that JC Rentals actually received some money from Dry Dock from -- was it gaming equipment you said?

A. We have the pool tables and games in there, like amusement games, and that's what JC Rentals owns.

MR. RAIFORD: And what about the ATM?

THE WITNESS: And the ATM, JC Rentals owns that, and that's what we get.

Q. So those particular items, then the -- you said the pool tables and the gaming equipment and the ATM are owned by JC Rentals?

A. Yes, all the amusement games in there. There's a box -- a golf game, several different kind of amusement games, is all JC Rentals.

Q. They're JC Rentals games and they're kept at Dry Dock, and for that --

A. That's what I get the money out of.

Q. And the money comes out of those games and that money then goes to JC Rentals?

A. Right.

[138], Ex. 6 at p. 6-7.

Richardson was also questioned about JC Rentals' ownership of the property on which Dry Dock operated at the time of the underlying events and the subsequent conveyance of the property to Dry Dock:

Q. Okay. And look on the front page, if you would. What does it say? Who's conveying to who?

A. JC Rentals.

Q. Conveying to who?

A. Dry Dock.

Q. Okay. Look on the back page. Do you see that diagram?

A. Yes.

Q. Okay. Who hired those surveyors?

A. I did.

Q. You did individually or Dry Dock or JC Rentals?

A. Dry Dock.

Q. Dry Dock hired them?

. . .

A. Yes.

Q. Okay. Why did Dry Dock hire those surveyors?

A. I don't know. I really don't remember this.

[146], Ex. 2 at p. 3-4.

Richardson also provided further background about JC Rentals' relationship with Dry Dock:

Q. And the money comes out of those games and that money then goes to JC Rentals?

A. Right.

Q. And that's what is considered to be -- I think you just said that's what, I guess Dry Dock was saying that's what leases --

*A. That's our rent.*

. . .

Q. So JC Rentals has continued to keep that same arrangement?

A. Yes.

Q. Even though they own the land now, right?

A. Who owns --

Q. Dry Dock owns the land.

A. *Yes.*

Q. *That's fine. So since Dry Dock owns the land JC Rentals has kept that arrangement in that --*

*A. That's our arrangement.*

Q. -- the money from the games continues to go to JC Rentals? Okay.

[142], Ex. 3 at p. 4-5 (emphasis added).

Against this factual backdrop, the Court reverts to the legal basis for JC Rentals' request for dismissal. In short, its contention is that "at all relevant times Dry Dock and JC Rentals were and are separate and distinct legal entities." [139] at p. 17. On this issue, JC Rentals emphasizes:

> JC Rentals has never operated Dry Dock Bar and Grill; has never employed any persons involved in the sale of food and beverages at Dry Dock Bar and Grill; does not supervise any persons involved in the sale of food and beverages at Dry Dock Bar and Grill; does not establish the policies and procedures for the sale of food and beverages at Dry Dock Bar and Grill; and JC Rentals does not receive any money from the sale of food and beverages at Dry Dock Bar and Grill, instead receiving only the proceeds of gaming machines and the ATM located at Dry Dock Bar and Grill.

*Id*.

The Court agrees that there is evidence in the record that JC Rentals and Dry Dock were separate in some (perhaps many) respects. However, the Court finds some additional considerations to be critical.

First, the distinction between JC Rentals' business income and Dry Dock's business income is not entirely clear. For example, during the JC Rentals' 30(b)(6) deposition, Richardson testified that JC Rentals received income from the pool tables, other gaming machines, and the

ATM located at Dry Dock as rent for the property. However, she also testified that that arrangement has not changed, despite the fact that Dry Dock now owns the property. This gives the Court pause as to whether the income which JC Rentals received from Dry Dock was in fact for rental of the property. Furthermore, when questioned about the documentation supporting the entities' arrangement, Richardson testified that there was no formal agreement between the entities. *See* [138], Ex. 5 at p. 9 ("We have pool tables, and that's just an agreement.").

Additionally, the Court notes Knox's deposition testimony. In particular, when questioned in her deposition about the payment she received for work at Dry Dock on the night in question, Knox specifically declined to answer when asked if she received payment from JC Rentals. The Court, consistent with the same reasoning set forth above in connection with Marter and Richardson's Motions [134, 136], finds that an adverse inference based upon this failure to respond is appropriate under the circumstances.

Finally, although the purpose underlying the transfer of the property from JC Rentals to Dry Dock in January 2022 is unclear, the fact that it occurred only approximately three months after the underlying events also gives the Court pause. While the property ownership issue might not, without more, be sufficient to preclude summary judgment, when considered in light of the other facts of this case (including but not limited to the fact that the underlying financial arrangement between the entities did not change thereafter), it further supports the Plaintiffs' position.

Ultimately, as the moving party, JC Rentals bears the burden to show that there is no genuine issue of material fact. *See Nabors*, 2019 WL 2617240 at *1. The Court finds that it has not done so. Rather, there is competent summary judgment evidence in the record indicating that

Dry Dock and JC Rentals were not so separate and distinct as to warrant summary judgment in JC Rentals' favor. JC Rentals' Motion [138] is therefore DENIED.

*Conclusion*

For the reasons set forth above, all pending Motions [134, 136, 138] are DENIED. The Plaintiffs will be permitted to proceed to trial on all claims.

SO ORDERED, this the 28th day of June, 2023.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE